UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

THE GRAND TRAVERSE BAND OF OTTAWA
INDIANS AND ITS EMPLOYEE
WELFARE PLAN,

     Plaintiffs,    Case No. 15-cv-13708

-v-
BLUE CROSS BLUE SHIELD OF    HONORABLE DAVID M. LAWSON
MICHIGAN,
    WITNESS.
_____/

     DEPOSITION OF GINA DAHLKE

APPEARANCES:

For the Plaintiff:

    BRYAN R. WALTERS (P58050)
    PERRIN RYNDERS (P38221)
    VARNUM LLP
    333 Bridge Street, N.W.
    PO Box 352
    Grand Rapids, Michigan 49501-0352
    (616) 336-6000

For the WITNESS:

    BRANDON C. HUBBARD (P71085)
    SAMANTHA A. PATTWELL (P76564)
    DICKINSON WRIGHT PLLC
    215 S Washington Square, Suite 200
    Lansing, Michigan 48933-1888
    (517) 487-4724

Also Present:  Michelle Heikka,
     Little River Band in-house counsel

Reported by:  Teri L. Heacock, RPR/CRR/CSR-2309

1    marketplace.  And with the subsidies and such if they

2    qualify, if they're low income enough, they could qualify

3    for subsidies.  So some of them are just not aware, so we

4    just try to encourage them to sit down with Theresa or

5    Roberta and see what their options are.

6  Q.  Do you currently have to pay any sort of biweekly premium

7    or monthly premium to participate in your Priority Health

8    plan?

9  A.  No, I don't.

10  Q.  Who pays for that?

11  A.  The Tribe.

12  Q.  Did the Tribe also pay for your health coverage before you

13    were on the Priority Health plan?

14  A.  Yes.

15  Q.  100 percent of it?

16  A.  Yes.

17  Q.  When you testified earlier about you try to get the

18    Medicare Like Rate.  What did you mean by that?

19  A.  We -- if they're hospital claims, we submit those for

20    repricing.

21  Q.  What do you mean *repricing*?

22  A.  For -- to get -- they're repriced at Medicare rates for

23    Native Americans.  That's what we -- we use.  The Native

24    Americans are allowed Medicare Like Rates at hospitals.

25    That's what we do.

1    we would save.  And so with the health director at the

2    time, her and I discussed, you know, should we try this,

3    should we not.  Because at the time we had no monies for

4    any kind of software repricing for Medicare Like Rates, and

5    we -- I had no clue how to start -- billing was not my

6    thing.  So, um, so we said, okay, yeah, what have we got to

7    lose?  It's a free coupon for ten of 'em.  And so we

8    contacted Forest County and, then we got their fax

9    information, and then they told us what they required us to

10   send over, and they would reprice them and send them back,

11   and that's what happened.  I think we sent seven that fall.

12   Seven of our largest ones that I could remember or pull

13   that were -- of people who had no insurance.  That's what

14   we sent first.

15  Q.  Have you ever sent to them claims for people that did have

16      insurance?

17  A.  Not 'til later.

18  Q.  And when you say *not until later*, what do you mean?

19  A.  Um, not for a couple years later.

20  Q.  Do you know why?

21  A.  Because we did not -- we weren't aware that Medicare Like

22      Rates also applied to native people in the PRC program that

23      also had a primary insurance.

24  Q.  What do you mean by that?

25  A.  That means that if they had Priority Health or ASC or Blue

1      Cross, that you could still submit the claim for Medicare

2      Like Rates and pay whatever was cheaper, pay the lesser

3      amount.

4  Q.  Let's take your participation in Priority Health at the

5      present time.

6  A.  Okay.

7  Q.  Does, to your knowledge, Priority Health pay claims at the

8      Medicare Like Rate because you're a tribal descendant?

9          MR. WALTERS:  Object to foundation.

10          THE WITNESS:  I don't know.

11  BY MR. HUBBARD:

12  Q.  Have you ever inquired?

13  A.  No.

14  Q.  Have you ever seen an EOB from a medical provider other

15      than the clinic that was, for example, Priority Health?

16  A.  Yes.

17  Q.  And is it safe to say that you have an understanding as to

18      what Medicare Like Rates are for services provided because

19      you're able to tell whether or not a Medicare Like Rate was

20      or was not applied?

21          MR. WALTERS:  Object to form and foundation.

22          THE WITNESS:  Not by looking at it, no.  I --

23      billing is not my thing, so I can't just look at a claim and

24      say, oh, yeah, that was already repriced.  I would have no

25      idea.  The only way I -- Forest County reprices them, and it

1    sends back an explanation of the repricing.  If it was just

2    came from -- if it just came directly from Blue Cross or

3    Priority Health, I would have no clue, because I don't know

4    what the hospital's market rates are, what their open market

5    is, and then what Priority Health or Blue Cross, *Oh, no, you*

6    *have to reprice that at this rate*.  No idea.

7    BY MR. HUBBARD:

8    Q.   So how do you find that out, as to whether or not Medicare

9         Like Rate was actually applied or not?

10   A.   I would submit it to Forest County, and they reprice it.

11   Q.   So -- and that currently includes claims where there's a

12        primary insurer?

13   A.   Correct.  Now we do, yes.

14   Q.   And remind me when that process started to take place.

15   A.   For primary insurance?

16   Q.   Yes, in Forest County.

17   A.   I can't be for certain.  I'm going to say maybe around

18        2014, sometime in that year.  I'm just -- it's all kind of

19        a --

20             MR. HUBBARD:  Is there a reason, Mr. Walters, why

21        you're nodding your head *yes*?  I'm just wondering.

22             MR. WALTERS:  Not at all, not at all.

23             MR. HUBBARD:  Okay.

24             THE WITNESS:  Oh, I didn't see him.  I was

25        looking --

1   BY MR. HUBBARD:

2   Q.   It's okay if you didn't see him or not.  I think he's maybe

3        subconsciously doing it.

4             MR. WALTERS:  Yeah.  So, I mean, I'm not

5        testifying.  I think that might be right, but I don't know.

6             MR. HUBBARD:  Understood.

7             THE WITNESS:  I'm guessing.  My best guess.

8   BY MR. HUBBARD:

9   Q.   Okay.  Is there an agreement with Forest County Potawanami

10       regarding the repricing?

11  A.   Yes.

12  Q.   Do you recall when that agreement was signed?

13  A.   The first one, in 2011.

14  Q.   You're saying *the first one*, so are there more than one?

15  A.   They have been expanded, I want to say.  That might not be

16       the right word, but 'cause 2011 was to just strictly

17       reprice Medicare Like Rate claims.

18  Q.   Then when you say *Strictly to reprice Medicare Like Rate*

19       *claims*, what do you mean?

20  A.   Because that's all that we -- that's all that we had.

21       That's all the knowledge that -- that Little River had to

22       reprice uninsured Medicare Like Rate claims, so that's what

23       they were repricing for us.

24  Q.   When you say that that's all that the knowledge you had

25       that the Tribe had, I'm trying to understand what you mean.

1   A.   Okay.  Let me rephrase that.

2   Q.   Sure.

3   A.   That's all that we knew to get repriced was the uninsured

4        claims at hospitals for Medicare Like Rates.

5   Q.   Is there a reason why that's all that you knew?

6   A.   Um, the only thing is sometimes when you don't go to area

7        meetings, um, where we sometimes had a health director,

8        sometimes didn't have a health director, so some meetings

9        got attended, some didn't at the area level.  And by *area*

10       *level* I mean our area is Bemidji area in Minnesota, and so

11       when we received additional information, then we added on

12       the 506 recovery, and then recently third-party billing.

13  Q.   When you say *506 recovery*, what do you mean?

14  A.   Okay.  506 recovery is because there's no statute of

15       limitations for tribes, so we can go back to that magic

16       date of July 5th, 2007, and have all those claims repriced,

17       including the ones with primary insurance, and so at that

18       point, instead of billing for them, because the majority of

19       them have already been paid, that's called recovery.  And

20       so, um, we pulled all the old claims we could find and

21       submitted them for recovery, and then Forest County sends

22       the letters and notifications to those vendors and -- and

23       tries to recover money.

24  Q.   Is the recovery, let's assume for the moment that Forest

25       County does recover money.  Where does that money come

1    from?

2  A.   It comes from the hospital.

3  Q.   The medical provider?

4  A.   Yes.

5  Q.   Then I'm assuming that Forest County has been successful in

6       that endeavor?

7  A.   Yes.

8  Q.   Do you or anybody at the PRC program keep a record of what

9       claims have and have not been sent to Forest County for 506

10      recovery?

11 A.   There is no written claim.  They are sitting in a box, the

12      ones that we hand back.

13 Q.   What do you mean *they're sitting in a box*?

14 A.   They're sitting in a box.  They're -- when -- if we get a

15      check back for those ones, then we highlight them,

16      because -- so they don't get pulled again.  So we try to

17      keep them separated from the rest of the other claims, so

18      they're -- they're in their own area in a box, so -- we

19      didn't file them back because we didn't want them to get

20      repulled by, *Oh, hey, this didn't get* -- so we leave them

21      out.

22 Q.   I'm sorry, I don't understand what you were just trying to

23      tell me.

24 A.   They're in a room, in one of our file rooms, in a locked

25      room, where they're kept in a box.  They have already been

1    submitted for recovery and we receive them back, and that's

2    where they're staying.  They're not like written down or

3    anything, they're just ones that we receive back.

4    Q.  And you testified earlier that you tried to find all the

5    claims that you could find for 506 recovery, to have those

6    submitted.  Do you recall that testimony?

7    A.  No.

8    Q.  Okay.  How did you go about determining what claims to send

9    for purposes of 506 recovery to Forest County?

10   A.  For Forest County for 506 recovery we went through -- from

11   2007 forward in everyone's files and pulled all the

12   hospital claims and sent them in.

13   Q.  And that includes for both uninsured and insured

14   individuals?

15   A.  Correct.

16        MR. WALTERS:  Once we've exhausted the 506

17   recovery topic, if we can just take a short break.

18   BY MR. HUBBARD:

19   Q.  Ms. Dahlke, you testified earlier that the 506 recovery

20   endeavor has been successful, correct?

21   A.  Thus far, yes.

22   Q.  Does the hospital make a payment to Forest County or does

23   the hospital make a payment directly to the Tribe?

24   A.  The checks go to Forest County.  I have gotten one or two

25   from some smaller hospitals, but I just notify them so they

1          MR. WALTERS:  Object to form.

2          THE WITNESS:  I don't know.  All I know is we

3     pulled all the -- they were only hospital.  No office

4     claims, just hospital.

5  BY MR. HUBBARD:

6  Q.  Why the distinction between hospital and office claims?

7  A.  Because Medicare Like Rates only for hospital.  Well, until

8     this last spring, but, yes, only hospital.  Only services

9     rendered at a hospital facility.

10 Q.  In the regular course of business here at the Tribe is it

11    the Tribe's regular practice to keep all of the claims from

12    hospitals that relate to the PRC program?

13 A.  Can you say that again?

14 Q.  In terms of keeping business records here at the Tribe is

15    what I'm trying to get at --

16 A.  Okay.

17 Q.  -- does the Tribe make it its business practice in

18    operating the PRC program to keep all of the claims

19    received from medical providers other than the clinic?

20 A.  For PRC?

21 Q.  Correct.

22 A.  We keep all of ours, yes.  We have to, um, for -- 'cause we

23    get audited and stuff every year for our files, and they

24    need to the claim and the PO, and they all need to match

25    up, so we keep all that.

1  Q.  And it's fair to say you've kept all that information since

2      July 5th of 2007?

3  A.  The -- yes, the majority of it.  The -- yes.

4  Q.  And in the process of submitting claims to Forest County

5      relative to the 506 recovery process that you've been

6      talking about, are those the claims that you've kept that

7      you provided to Forest County?

8  A.  Yes, we keep those.

9  Q.  I guess what I'm trying to get at it is sounds like in

10     regular business course of practice the Tribe keeps all of

11     the claims from providers that it receives that bear upon

12     the PRC program, correct?

13 A.  We have kept the majority of them, yes.  PRC can purge

14     after seven years, but we've kept all the 5006 recovery

15     ones dated back to '07, yes.

16 Q.  Okay.  The claims that the PRC program is actually kept

17     since July 5th, 2007, are the same claims that have been

18     submitted to Forest County for 506 recovery, correct?

19 A.  Yes.

20 Q.  Is the expectation from your perspective that Forest County

21     will be repricing each one of those claims in connection

22     with the 506 recovery process successfully?

23            MR. WALTERS:  Object to form.

24            MR. HUBBARD:  I asked from her perspective.

25            MR. WALTERS:  I object to the form of the

1  Q.  Are you copied on those correspondences to hospitals?

2  A.  No, the -- there's a general letter that Forest County

3      generated in the beginning of 506 recovery and Larry signed

4      it, the Ogema, and so they use that when they're submitting

5      it to.  So it's from them on their letterhead, but it's

6      also signed by the Ogema showing that he okays -- he's

7      okaying them seeking that reimbursement.

8  Q.  And you have copies of those letters?

9  A.  I don't have one on hand, but I'm sure I could probably get

10     one.  I've seen it, but I haven't -- I don't have a copy of

11     it, no.  It's just one letter.  It's just a simple --

12 Q.  It's a form letter that's sent to different providers?

13 A.  Yes.  Yes.

14 Q.  Do you know if in connection with 506 recovery process that

15     as to whether claims have been submitted where Blue

16     Cross/Blue Shield of Michigan was the primary insurer?

17 A.  I can't say for specifically, but I'm sure that they were.

18     Um, yes, they were, actually.

19 Q.  How do you know that?

20 A.  All of them were.

21 Q.  All of them were?

22 A.  Well, because Blue Cross/Blue Shield of Michigan is used by

23     the resort employees, so those get submitted.  Um, when --

24     all of 'em.  Everyone with a primary insurance that has --

25     that went -- that had a hospital service was pulled and

1     sent.

2  Q.  When you say -- you made reference to the casino, correct?

3  A.  Yes.

4  Q.  Are you talking with casino employees that also happen to

5     be tribal members or tribal descendants that participate in

6     the PRC program?

7  A.  Yes, that's what --

8  Q.  Before submitting claims to Forest County in connection

9     with the 506 recovery process, you were testifying earlier

10    that in connection with the PRC program claims would first

11    be submitted to Blue Cross/Blue Shield of Michigan,

12    correct?

13  A.  Yes.

14  Q.  And that's because they were the primary insurer and the

15    PRC program was the payer of last resort, correct?

16  A.  Yes.

17  Q.  And it's -- I'm assuming it's fair to say that when you

18    were undergoing that process that you knew that Blue

19    Cross/Blue Shield of Michigan was not paying Medicare Like

20    Rates as the primary insurer, correct?

21         MR. WALTERS:  Object to foundation.

22         THE WITNESS:  I have no idea if they were or not,

23    'cause I don't know the pricing for that.  Like just by

24    looking at it, I can't tell that, oh, yeah, that was the

25    rate given to them.  I wouldn't know, unless it was --

1    A.    I think there were some sent before in the months prior to
2          this, trying to get -- trying to inform tribes of this, but
3          it didn't -- I don't recall them all quoting all of the
4          Section 506 that I told you about before.
5    Q.    Earlier you testified that Forest County partner has
6          entered into an agreement with the Tribe for repricing and
7          also Section 506 recovery, correct?
8    A.    Correct.
9    Q.    What is *repricing*?
10   A.    Repricing it for Medicare Like Rates, the repricing of the
11         claim to Medicare Like Rate.
12   Q.    And in what context is that done?
13   A.    I don't know what you mean.
14   Q.    Sure.  I'm trying to get an understanding of how that
15         exactly works the repricing.  So what I'm trying to get to
16         the bottom of is the relationship between Forest County and
17         the Tribe, what the Tribe does, what the Forest County does
18         in the context of repricing.  Does the Tribe provide the
19         claim to Forest County and then Forest County reprices it,
20         sends it to the provider?  I just want to get an
21         understanding as to how that works.
22   A.    Okay.
23               MR. WALTERS:  Objection to form.
24               THE WITNESS:  The Little River, this is not every
25         Tribe, contracts with another group to reprice our stuff.

1       We don't have the software, so we take the claims, just the

2       bills, just the claim only, and we make a list and we send

3       them secured fax to Forest County.  They reprice them on

4       their software and they send them back with the repricing

5       explanation, and that's how they're processed.

6    BY MR. HUBBARD:

7    Q.   Do you recall when that process first started to take

8         place?

9    A.   In 2011.

10   Q.   And was that for the repricing of claims for both uninsured

11        and insured individuals?

12   A.   No.  It was only uninsured individuals.

13   Q.   Does Forest County currently reprice claims for the Tribe?

14   A.   Yes.

15   Q.   And does Forest County currently reprice claims for the

16        Tribe for both uninsured and insured individuals?

17   A.   Yes.

18   Q.   And that's different than the 506 recovery process that you

19        were testifying about earlier, correct?

20   A.   Correct.

21   Q.   When is it that the repricing of claims started to occur

22        with Forest County for insured individuals?

23   A.   I want to say 2014, right around there.  For everyone,

24        2014, early 2015.  Without looking back I can't --

25              MR. WALTERS:  And I'll object as asked and

1    answered I.  Think you might have answered that earlier.

2                THE WITNESS:  Yeah, I think I did.

3    BY MR. HUBBARD:

4    Q.  If you saw an agreement, would that refresh your

5        recollection as to when that actually started to occur?

6    A.  I don't know.

7    Q.  Let me ask it a different way.  Was there a separate

8        agreement that was signed with Forest County that was the

9        date upon which the repricing started to occur for insured

10       individuals?

11   A.  No.

12   Q.  So is it that an agreement was already in place in the

13       Tribe consistent with the agreement that was already in

14       place started sending to Forest County both uninsured and

15       insured claims?

16   A.  Yes.

17   Q.  And you think that that happened sometime in 2014 or

18       early 2015?

19                MR. WALTERS:  Objection, asked and answered.

20                THE WITNESS:  That's approximate.  I don't have a

21       definite for that day, but, yeah.

22   BY MR. HUBBARD:

23   Q.  Did you ever communicate with anybody about that?

24   A.  About what?

25   Q.  About the fact that the Tribe was starting to send over

1   A.   Yes.

2   Q.   *Copy of your driver's license.*  Do you see that?

3   A.   Yes, I do.

4   Q.   Okay.  The next one is *Copy of all insurance cards.*  Do you

5        see that?

6   A.   Yes, I do.

7   Q.   So was this application available in 2010, or a form of

8        this application available in 2010 that tribal members

9        would fill out?

10  A.   Yes.

11  Q.   Okay.  And in 2010 did the PRC program require copies of

12       all insurance cards at that time?

13  A.   Yes.

14  Q.   And if a tribal member or tribal descendant was

15       participating in the Blue Cross/Blue Shield of Michigan

16       plan, would the PRC program require a copy of a Blue

17       Cross/Blue Shield of Michigan insurance card?

18  A.   Yes.

19  Q.   Does the Tribe have those on file still?

20  A.   What year are you looking for?  Possibly.

21  Q.   Is there a time by which the Tribe had it on file but

22       appeared in which the Tribe has gotten rid of them?

23  A.   Yes.  According to IHS, PRC only has to keep our

24       documentations and claims for seven years.

25  Q.   But in the context of claims, you've kept them all since

1         July 5th of 2007, correct?

2    A.   Just the hospital ones.

3    Q.   In connection with this lawsuit has anybody ever asked you

4         to provide to them a copy of the claims that have been

5         submitted by the Tribe to Forest County for 506 recovery?

6    A.   We -- yeah, we've provided copies, but it wasn't just for

7         506 recovery, it was just claims.

8    Q.   What do you mean?

9    A.   Claims, like tribal member claims.  That tribal members

10        that were signed up for PRC that may have used a hospital

11        claim.  That was -- I don't know if they were all submitted

12        for 506 or -- offhand, but, yeah.

13   Q.   So did you provide all of the claims since July 5th of

14        2007?  Is that what you're saying?

15   A.   Yes.

16   Q.   And --

17   A.   Or I don't know the exact date, how far back, no.  I don't

18        think they went -- I think they went back to 2008.

19   Q.   To whom did you provide those to?

20   A.   Shane and Rebecca.

21   Q.   Who's Shane and Rebecca?

22   A.   Shane and Rebecca, the legal staff.

23   Q.   And can you tell me the dates or the month that you

24        provided those?

25   A.   I believe it was toward the end of August.  Yes, it was

1        just me and two other people at the time.  I was short two

2        people then.  It was the list of requirements from Blue

3        Cross/Blue Shield, so we were sent that and we pulled what

4        we could find and gave them to our attorneys, and I'm

5        assuming they transferred them to you.

6   Q.   When you say *the list of requirements from Blue Cross/Blue*

7        *Shield*, what do you mean?

8   A.   Okay, list of requirements might not have been the right --

9   Q.   No, it's okay, I'm not trying to be difficult.

10            MR. WALTERS:  Yeah.  And I want to be very careful

11       here.  If you've you got a document from the Tribe's legal

12       counsel saying these are the things we want you to track

13       down, that's an attorney/client privileged communication,

14       and you ought not testify about that.  If there's some other

15       Blue Cross/Blue Shield document or something like that that

16       you're talking about, obviously you can testify about that.

17            THE WITNESS:  Well, I can't honestly remember it

18       was strictly from then or if it was transferred from Blue

19       Cross/Blue Shield to me.

20   BY MR. HUBBARD:

21   Q.   Let me ask it this way.  The document that you saw, did it

22       have on the front of it --

23            If we could introduce this as Deposition Exhibit

24       Number 4.  Thank you.

25            (At 12:46 p.m. - Off-the-record discussion.)

1                    (Deposition Exhibit Number 4 marked.)

2    BY MR. HUBBARD:

3    Q.   The document that you saw, the first page of the document

4         that was given to you, did it have something similar to

5         that on it?

6    A.   No.

7    Q.   Was it an email communication that you received?

8    A.   Yes.

9    Q.   Did the email communication that you received have an

10        attachment to it?

11   A.   I don't recall.

12   Q.   Do you recall when you received the request from your

13        counsel?

14             MR. WALTERS:   Objection, asked and answered.   We

15        have covered this.

16   BY MR. HUBBARD:

17   Q.   I think we've covered the date upon which she provided it,

18        which was late in August.   I want to know the date that it

19        was actually requested that you provided.

20             MR. WALTERS:   Okay.   Fair enough.

21             THE WITNESS:   I don't know how much -- I think

22        early August.   We had less than 30 days, I believe, I don't

23        remember.   It was on a timeline.

24   BY MR. HUBBARD:

25   Q.   Understood.   I'm going to introduce another copy of a

1        document.   Mark this as Exhibit Number 5.

2                      (Deposition Exhibit Number 5 marked.)

3    BY MR. HUBBARD:

4    Q.   Ms. Dahlke --

5    A.   Hm-hmm.

6    Q.   -- have you ever seen this document before?

7    A.   Yes.

8    Q.   And do you understand what it is?

9    A.   Yes, I do.

10   Q.   Can you please tell me what it is?

11   A.   It's our agreement with Forest County Potawanami.

12   Q.   When you were testifying earlier regarding the repricing of

13        claims --

14   A.   Yes.

15   Q.   -- with Forest County Potawanami consistent with an

16        agreement, is this the agreement that you were talking

17        about?

18   A.   Yes.

19   Q.   And you testified earlier that there was a time by which

20        underneath this agreement that you -- that PRC program

21        started to submit both uninsured and insured claims,

22        correct?

23   A.   Yes.

24   Q.   And that was done underneath this agreement?

25   A.   Yes.

1   Q.   Do you know, Ms. Dahlke, if this particular agreement is

2        still in effect with Forest County?

3   A.   The agreement is still in effect.  Um, I believe it's been

4        amended.  I wouldn't have the latest copy for the 506

5        recovery and to include third-party billing.

6   Q.   When you say *to include third-party billing*, what do you

7        mean?

8   A.   I mean that Forest County, those are the services they

9        provide, so it's all in one agreement.

10   Q.   Is third-party billing different than repricing and 506

11        recovery?

12   A.   Yes.

13   Q.   Can you tell me what that is?

14   A.   Not really.  I'm not a biller.

15   Q.   Okay.  Do you know what it relates to, at least?

16   A.   The clinic services.

17   Q.   Okay.

18   A.   For direct care.

19   Q.   For direct care?

20   A.   Hm-hmm.

21            (Deposition Exhibit Number 6 marked.)

22   BY MR. HUBBARD:

23   Q.   Ms. Dahlke, I've handed you a document that's been marked

24        as Dahlke number 6.  Do you recognize this document?

25   A.   I think so.  It looks like one of the amended, yes.  It's

1    an MLRN recovery.

2 Q. Is this the document that you referred to earlier as what

3    you thought might be an amended version of the 2011

4    repricing agreement?

5 A. Yes.

6 Q. And is it your understanding that this particular document

7    that's been marked as Dahlke Exhibit Number 6 covers both

8    repricing and 506 recovery?

9 A. Yes.

10 Q. I'd like for you to please turn to provision 9.1, which is

11    titled *Notice to parties*?

12 A. Okay.

13 Q. And it says *To Program Sponsor,* and it says *Attention:*

14    *Gina.* Is that your maiden name that's there?

15 A. Yes.

16 Q. Okay. And is that your signature?

17 A. Yes.

18 Q. Have you ever received any sort of notices or

19    communications under this agreement at all because it's

20    supposed to be sent to your attention?

21 A. Any what? Have I received any, what did you say?

22 Q. Notices or communications underneath this agreement?

23    Because it would appear to me that any such notice or

24    communications are to go to your attention.

25 A. Yes.

1   A.   Okay.

2   Q.   And can you please look at section 1(a) there?

3   A.   Okay.

4   Q.   Where it says *Upon execution of this agreement*.  Do you see

5        that?

6   A.   Yes.

7   Q.   It says the *The Tribe shall provide to Forest County*

8        *Potawanami Insurance Department*, it says *FCPID* for short?

9   A.   Yes.

10  Q.   Files for claims eligible for Medicare Like Rates for

11       Medicare Health Care Service?

12  A.   Yes, sir.

13  Q.   It goes on to say *At any time while this agreement is in*

14       *effect, the Tribe may submit claims to be audited from July*

15       *5th, 2007, to the present year pursuant to the terms of*

16       *this agreement*.  Do you see that?

17  A.   Yes.

18  Q.   Earlier, when you testified that you provided to Forest

19       County claims since July 5th of 2007, were you doing that

20       because of this particular agreement?

21  A.   Yes.

22  Q.   Subparagraph C says *FCPID shall conduct an audit of the*

23       *claims files to determine whether any overpayments were*

24       *made*.  Do you see that?

25  A.   Yes.

1   Q.   And then it says *They shall determine if the appropriate*

2        *Medicare Like Rate was paid, and if not, request*

3        *reimbursement from the provider for the amount that exceeds*

4        *the Medicare Like Rates.*  Do you see that?

5   A.   Yes.

6   Q.   Are you aware whether or not any such audit ever took

7        place?

8   A.   That's what they do when I send a claim to them.

9   Q.   Okay.

10  A.   They audit it and then submit it with that letter, and then

11       they get the checks back and forward them to us.

12  Q.   And you have copies of all those communications?

13  A.   Of all the checks and the invoices, yes, I do.

14  Q.   Okay.  And then it says, in subparagraph E, *FCPID will*

15       *complete the audit and provide the detailed accounting of*

16       *the audit to the Tribe in writing, including the results of*

17       *the audit, within 180 days of FCPID's receipt from the*

18       *Tribe of the files to be audited.*  Do you see that?

19  A.   Yes.

20  Q.   Have you ever seen a of the detailed accounting of the

21       audit that Forest County has performed on behalf of the

22       Tribe?

23  A.   Yes.  They submit those with every check, and then they

24       just keep compiling and adding on.

25  Q.   So when the PRC program made the decision to provide all of

```
 1        the claims since July 5th of 2007 to Forest County, did
 2        you -- did the PRC program or did you do that all at once
 3        like on a single day?  How was that process undertaken?
 4    A.  We started going through all the files, pulling all of the
 5        old claims.  We boxed them up via Fed Ex, 'cause you can't
 6        fax you that that stuff, so we were send them express via
 7        Fed Ex.  That's how -- and a little at a time, because
 8        there wasn't a box big enough, so we would just send them a
 9        box every day at the beginning, then it was every week, and
10        then now it's just only a few at a time.
11    Q.  There's only a few at a time, 'cause it's only for those
12        claims that are coming in for new medical services that
13        were rendered?
14    A.  Those get faxed.
15    Q.  Understood.
16    A.  The recovery ones are just the older ones that have already
17        been paid.
18    Q.  Is the PRC program still going through files to find
19        additional claims?
20    A.  Yeah, we do.  We constantly are double checking ourselves.
21        We try to do that, so every time we're in a file I or my
22        staff we just like if you're flipping through it's like,
23        oh, hey, then we double check to see if it's been sent out
24        and we just try to double check ourselves, there's only
25        like this much more to send out, we don't.
```